## Belzoni Oil Company et al. v. Yazoo & Mississippi Valley Railroad Company et al.

### [47 South. 468.]

1. CORPORATIONS. *Adoption of officer's act. Estoppel. Deeds.*

   A written agreement giving a license to a railroad company to locate and use a spur track over the land of a corporation, though signed by its president in his individual name, is the contract of the corporation if it knew of the long use of the track for its benefit and acquiesced therein, and it is estopped to claim that it did not execute the agreement.

2. LICENSE. *Right given by agreement. Railroad spur track.*

   A writing in the form of an agreement between an oil company and a railroad company, and the successors and assigns of each, reciting that the oil company desired side tracks to facilitate its business, and wherein the oil company agreed to furnish the needed ground and give the railroad company the exclusive possession thereof so long as the agreement lasted and to do the grading and furnish the ties, and by which the railroad company was to construct the tracks and be the owner of them, and the materials therein, with the right on thirty days' notice to

abandon the use of them and remove the materials, confers a mere license, not coupled with an interest in the land, and does not grant an estate or easement.

3. SAME. *Revocation. Refunding expense money.*

A mere license to maintain a spur track on the land of the licensor is revocable without refunding to the licensee any sum on account of expenditures made by him in laying the track.

4. INJUNCTION. *Chancery pleading. Amendment of bill.*

In determining whether an injunction granted on an original bill shall be dissolved, an amended bill should be looked to; and it will not be dissolved where the same injunction in effect should be granted on the amended bill, which is at the same time under consideration.

5. SAME. *Amending bill. Changing cause of action.*

An amended bill does not change the cause of action, where the foundation fact, a certain agreement for a spur track of a railroad, is the same, and the other facts are practically the same, except that the pleader draws different conclusions and makes different special prayers for relief; the object of both bills for injunction being the same, to enable another railroad than defendant to run its track into complainant's yard, the first bill drawing the conclusion that the materials in the track were complainant's property, the agreement under which the road was constructed on its land having been made without its authority, and praying that defendant be restrained from interfering with the crossing of and connection with the track by the other railroad, and the amended bill drawing the correct conclusion that the agreement was a license, which complainant had revoked, and specially praying that defendant be restrained from using the land for the track and be required to remove it.

FROM the chancery court of Washington county.

HON. PERCY BELL, Chancellor.

Consolidated suits, in one the Yazoo & Mississippi Valley Railroad Company was complainant one Cassleman, the president of the Belzoni Oil Company and the Delta Southern Railway Company, were defendants; in the other the Belzoni Oil Company was complainant and the Yazoo & Mississippi Valley Railroad Company was defendant. From a decree, seemingly unsatisfactory to all parties, the oil company and others appealed

to the supreme court and the railroad company and others prose-
cuted a cross-appeal.

The facts are fully stated in the opinion of the court.

*Campbell & Cashin,* for appellant and cross-appellee.

In *Wheelock v. Noonan,* 108 N. Y. 179, a mandatory injunc-
tion was granted to compel the removal of a large quantity of
stone from plaintiff's land, placed there by the defendant under
a license, which he had abused, and also which had expired, on
the ground that the stone constituted a continuous trespass,
which involved, for its redress, a multiplicity of suits; and in
*Broome v. New York, etc., Co.,* 42 N. J. Eq. 141, a similar in-
junction, on the same ground, was granted, commanding the
removal from plaintiff's land of a number of poles; and the
jurisdiction of chancery courts to grant mandatory injunctions,
and, to do so in proper cases upon interlocutory application, is
so firmly established as to obviate the necessity of citing au-
thorities.    However, numerous cases showing various circum-
stances and conditions under which such injunctions have been
granted, are collected in the note to *Murdock's case,* 20 Am.
Dec. 398, and in the note to the *City of Moundville v. Ohio
River Co.,* 20 L. R. A. 161, and in the latter note, it is shown
that it is no longer necessary that such injunctions should be
in a negative or prohibitory form, but that the tendency, in the
present day, is for the court to say, in the first instance, what
it means, and direct the removal of the injury by a plain com-
mand to that effect.

In *Alcorn v. Alcorn,* 76 Miss. 907, 25 South. 877, the grant-
ing of a preliminary mandatory injunction was sustained, the
court saying, in effect, that while such injunctions are granted
with great caution prior to a full hearing, nevertheless, they
are to be granted prior thereto, "where the exigencies of the
case are great;" and in *Gulf Coast Co. v. Bowers,* 80 Miss.
570, 32 South. 113, the court recognized the propriety of
granting a preliminary mandatory injunction, saying that "it

is a sound rule that a writ of this character should not issue, unless the right to it is so satisfactorily shown that there can be no reasonable doubt of its propriety. The case made should be such that there can be no probability that the defendant can make a valid objection to it;" and, "unless the grounds for a preliminary injunction be inexpungable, it is the safer rule to hear both sides before directing its issuance."

In section 2 of High on Injunctions, it is said that "where, upon interlocutory application it is clear that the plaintiff will be entitled to a final mandatory injunction, an interlocutory mandatory injunction may be allowed. And, when there is a wilful and unlawful invasion of the plaintiff's right against his protest and remonstrance, the injury being a continuing one, a mandatory injunction may be granted in the first instance."

The record in this case shows with what stubborness the Yazoo, etc. Railroad Company has sought to prevent said crossing and connection, and to hinder said oil company in the management and control of its affairs and property, by the continuous occupancy of the oil company's land with its tracks. It based its right of occupancy upon the written contract between it and S. Castleman, who had no interest whatever in the land; and alleged acquiescence therein by the oil company, resulting from its said tracks; and, in all of its pleadings, first, in its original bill, and then in its answer to the oil company's bill, and then in its amended and supplemental bill, and then by the affidavits of the several witnesses, it refers to said contract with said Castleman, as the basis of its right; while the affidavits, in behalf of the oil company, clearly showed that neither it, nor any of its directors, other than said Castleman, ever knew of the existence of said contract; and everything, in support of the railroad company's claim of the oil company's acquiescence in said contract, or its estoppel growing out of its use of said tracks, was presented to the chancellor as fully as it is likely could be done on the final hearing. So that, the substantive facts relied

on by said railroad company, to-wit: said contract with Castle-man, and the use of said tracks by the oil company were duly presented to the chancellor by the pleadings, exhibits and affi-davits; and the chancellor, seeing that, on the final hearing, the oil company would be entitled to a mandatory injunction, granted it on the preliminary hearing.

The contract with Castleman, by virtue of which said tracks were constructed, was, in legal effect, nothing more than a li-cense, and, even if he had been the owner of the land, the li-cense thereby given, was revocable at will; for it is settled by the weight of authority that a mere license, whether for val-uable consideration, or where great expense has been incurred by the licensee in pursuance of the license, is revocable at the will of the licensor. *Beck v. Louisville, etc. R. Co.,* 65 Miss. 172, 3 South. 252; *Kremer v. Chicago, etc. R. Co.,* 38 Am. St. Rep. 468; note to *Lawrence v. Springer,* 31 Am. St. Rep. 712, and it makes no difference whether the license is oral or in writ-ing. 25 Cyc. 645.

In some states, when a licensee has acted under the license, and has incurred expense in making valuable improvements, or otherwise, equity regards it as an executed contract, or ground of equitable estoppel, and will not permit it to be re-voked; but, in the note to *Lawrence v. Springer, ubi supra,* the authorities *pro* and *con* on that proposition, are collected; and it is there said that the line of cases holding revocability of the license under such circumstances is founded upon the better rea-son; and, among the cases there cited as supported by the better reason is *Beck v. Louisville, etc. R. Co., ubi supra,* wherein our supreme court repudiated the doctrine that acquiescence on the part of the owner of the land, in the building of a railroad thereon, at great expense, will estop him from recovering the land, and held that the owner could enjoin in chancery the use of said land for the railroad.

The contract with Castleman, upon which said railroad com-pany relies, provides that Castleman should furnish the land

needed for the construction of the tracks, but does not use a single word of grant or transfer, or as showing any intention to vest any interest in the land to the railroad company. On the contrary, it is therein expressly stipulated that the tracks should be and remain personal property, and no part of the real estate, and that the same could be removed by the railroad company at any time on thirty days' notice; and since the contract contained no words of grant or transfer, and by its terms excluded all intention of vesting any interest in or claim to the land occupied by the tracks, the true construction and legal effect of the contract, was to confer upon the railroad company a mere license, and as such, revocable even by said Castleman, had he been the owner of said land.

At the time said tracks were constructed, the railroad company assumed that said Castleman was the owner of said land, and the oil company did nothing to aid, encourage, or mislead the railroad company in making the expenditures necessary to construct the tracks.

The oil company's title to the land was on record, and it did nothing to mislead the railroad company in regard thereto. Nor did it do or say anything to induce the railroad company to incur the expense of constructing said tracks. All that was done by the oil company was to look on in silence, and to allow, without objection, the railroad company to use said tracks; and that did not amount to estoppel. *Staton v. Bryant,* 55 Miss. 261; *Sulphine v. Dunbar,* 55 Miss. 255; *Murphy v. Jackson,* 69 Miss. 403, 13 South. 728; *Hill v. Nash,* 73 Miss. 849; and *Beck v. Louisville, etc. R. Co.,* 65 Miss. 172, 3 South. 252.

Having undertaken to show that the court did not err in granting the mandatory injunction on the oil company's amended bill, we will now undertake to show briefly that the court did err in dissolving the injunction theretofore granted on the oil company's original bill.

Had the oil company's amended bill made a new and different case from that made by its original bill, or materially

changed the object sought by the latter bill, the injunction theretofore granted on the latter bill might with propriety have been dissolved, regardless of the state of the case made by the amended bill; but there was no material or practical difference in the object sought by the two bills, nor did the amended bill state a different case.

It is true that the amended bill in its statement of the facts and its prayer for an injunction was framed in language somewhat different from that used in the original bill; but practically, in both, one and the same object was sought, and that was to enable the Delta Southern Railway to reach the oil mill over the right of way, which the latter had conveyed to it.

*Mayes & Longstreet* and *C. N. Burch,* for appellees and cross-appellants.

The decree of the court below dissolving the injunction granted on the original bill of the Belzoni Oil Mill Company is correct; a careful reading of that bill will conclusively demonstrate that the action of the court below was not only eminently proper, but was unavoidable.

The theory of the original bill of the Belzoni Oil Mill Company and the main alleged equity on which the relief prayed by it is founded, is wholly untenable under the law or admitted facts of the case. In no phase of the law and under no construction of the contract, could the Belzoni Oil Mill Company claim to have acquired ownership of the spur tracks, switches, etc., of the Yazoo & Mississippi Valley Railroad Company. The amendment allowed at the hearing, striking out paragraph 4, did not change the nature of the bill or of the character of the alleged right asserted by it. The chancellor could not find that by the course of dealings between the parties and the transfers of the land, that the Belzoni Oil Mill Company was the owner of these tracks, switches and appurtenances; therefore, it being clearly apparent to the chancellor that the allegations of ownership were untrue and unsupported by law

and the evidence, he had no alternative except to disallow this claim and then to dissolve the injunction which had been founded on it.

The court below erred in allowing the filing of the amended bill and in allowing the amendments thereto after the hearing was practically ended.

It is undoubtedly true that this amended bill set up an entirely new cause of action, totally dissimilar to that asserted in complainant's original bill. The amended bill did not merely extend or elaborate any claimed equity adverted to in the original bill, nor does it assert a proposition in any wise germane to or kindred with the alleged equity of the original bill. The theory of the amended bill was entirely at variance with the theory of the original bill. The original bill asserted ownership in complainant; the amended bill asserted ownership in the defendant. The original bill denied all right and authority to the defendant; the amended bill asserted a limited right and authority in the railroad company. It would be difficult to conceive of any pleading which could so reverse the positions and controversies of the parties to the litigation. *Wright v. Frank,* 61 Miss. 35.

The chancery court erred in declaring that the contract of May 22, 1900, granted to the Yazoo & Mississippi Valley Railroad Company only a license, revocable in the first instance by Castleman or later by the Belzoni Oil Mill Company, the owner and grantee of the lands in possession at the beginning of this litigation, and further that the Belzoni Oil Mill Company had revoked such license.

In the first place it will be observed by the court that in the original bill in this case, the ownership of the tracks was claimed to be in the Belzoni Oil Mill Company, and by the second bill filed on the 13th of September, 1907, to be in the Yazoo & Mississippi Valley Railroad Company. The amended bill was filed fourteen months after the original bill was filed, and in and by this bill, it is claimed that the presence of the

tracks of the Yazoo & Mississippi Valley Railroad on the lands of the Belzoni Oil Mill Company is a trespass and they seek to have them abated as a special nuisance. There is nothing in this last or amended bill by the Belzoni Oil Mill which avers that it, as an organized company and the then owner of the lands on which the tracks are located, had by any official ac· tion of the corporation, revoked or attempted to revoke the so called license of the Yazoo & Mississippi Valley Railroad. There is no proof in this whole transcript of any official action by the Belzoni Oil Mill Company peremptorily revoking the so called license of the Yazoo & Mississippi Valley Railroad Company, or giving notice by said corporation in an official way to the Yazoo & Mississippi Valley Railroad Company of such revocation and of any requirement that the tracks should be removed.

As there was no proof of final revocation by the corporation, that the court below could have found, from any of the evidence) in the case, peremptorily, that the Belzoni Oil Mill Company had revoked the license and ordered the removal of the tracks. The threat to a railroad company that "unless you grant certain privileges we will compel you to remove your track" is a very different thing from formal action by the board of directors saying to this railroad company that "as you have refused these privileges, we will now deny ourselves the advantages of track connections with you and you must move out."

It is true that as a rule grants of certain privileges by parol are held to be merely licenses, revocable at the will of the person who is claimed to have granted them, and the policy of such rule is justified on the theory that serious rights in and about realty should not be allowed to rest on and be determined by mere parol agreements, but it does not follow that where a privilege has been granted in writing, it stands on the same plane with verbal agreements, or may be revoked at the will and pleasure of anyone.

There are abundant authorities to the effect that where a

license has been granted and the licensee has entered on the premises and made valuable improvements and expended money; that such licenses are not revocable as long as the business conducted under them serves the original purpose and design of the license. To such effect are the following authorities: "A license coupled with an interest is irrevocable." *Railroad v. Hall,* 135 Ind. 91. "A telegraph company which has executed a written license to construct its line along a railroad right of way, by the expenditure of money in the construction of the line, has acquired an interest in the realty, so that the license has become non-revocable." *Western Union Tel. Co. v. Pennsylvania R. Co.,* 129 Fed. 849. "Where a dam has been built and pipes laid by a licensee, with consent of the licensor, for the diversion of water, the license is irrevocable, so long as the daming pipes remain for the purpose for which they were constructed." *Curtis v. Water Company,* 20 Ore. 34.

WHITFIELD, C. J., delivered the opinion of the court.

The case made by the facts is as follows: The Yazoo & Mississippi Valley Railroad Company has a line of railroad extending through the town of Belzoni, in Washington county, Miss., and early in the year 1900 S. Castleman applied to it for the construction of certain spur tracks to extend from its main line of railroad to the gin plant of the Belzoni Gin & Seed Company, in which he was largely interested, and to connect with the plant of the Belzoni Oil Company and a sawmill and other enterprises, all of which were then in contemplation, but not constructed. Accordingly, in May, 1900, said S. Castleman and said railroad company entered into a written contract for the construction of said spur tracks, wherein it was agreed, in effect, that said S. Castleman was to furnish the land and cross-ties needed therefor, and said railroad company was to furnish and lay the rails, and was to have exclusive possession and control thereof, and that said spur tracks were to be treated as personal property, and not a part of the real estate or land

upon which they were placed, with the right in said railroad company to remove the same at any time on thirty days' notice. At the time this contract was made said Castleman had no interest in the land upon which said spur tracks were constructed, and never thereafter acquired any; but at that time said land was owned by the Belzoni Land Company, a corporation, which afterward conveyed the same by deed, together with other surrounding land, to the Belzoni Oil Company, another corporation, which afterwards constructed a mill plant thereon, contiguous to said spur tracks. Said Castleman is the president of said Belzoni Oil Company, and has been its president since its organization, some time in the year 1900, and was also president of said Belzoni Land Company at the time it conveyed said land to the Belzoni Oil Company, and was president of both companies at the time said contract for the spur track was made, as well as at the time of his negotiations with said railroad company leading up to said contract; but, notwithstanding the fact that the title to the land on which said spur tracks were constructed was shown by the public records to be in said Belzoni Land Company, and notwithstanding the corporate character of the various enterprises which said Castleman hoped to foster by the construction of said tracks, said railroad company entered into said contract for the construction thereof with said Castleman in his individual capacity, without any reference whatever to said Belzoni Oil Company or to any of the other corporate enterprises to be erected contiguous to said tracks.

In 1906 the Delta Southern Railway, another corporation, was engaged in the construction of a railroad through said county, passing through said town of Belzoni, and acquired by warranty deeds from the Belzoni Oil Company certain rights of way for its main line and certain spur tracks over the land of the Belzoni Oil Company, which crossed said spur tracks of the Yazoo & Mississippi Valley Railroad Company, and covered part of the ground occupied by them at or near the mill plant of said Belzoni Oil Company; and when the Delta Southern Railway began to construct a crossing over its road over

said spur tracks of the Yazoo & Mississippi Valley Railroad Company, and to connect its spur tracks therewith at the point where its right of way coincided therewith, leading into the oil mill of the Belzoni Oil Company, the Yazoo & Mississippi Valley Railroad Company interfered and sought to prevent said crossing and connection.   The Belzoni Oil Company's mill was so constructed as to make it impossible for the spur tracks of both of said railroad companies to enter the same without occupying the same space at and within the mill, and it was exceedingly desirable and beneficial to the Belzoni Oil Company to have the spur tracks of the Delta Southern Railway enter its mill, as otherwise the Yazoo & Mississippi Valley Railroad Company would enjoy a monopoly in the transportation of the produce of said mill therefrom and commodities thereto, greatly to the injury of said oil company; and when the Yazoo & Mississippi Valley Railroad Company objected to the Delta Southern Railway crossing and connecting with its spur tracks, said Castleman, having failed to induce it to consent to such crossing and connection, offered to take up its spur tracks and place the materials where it might designate, and to have the Belzoni Oil Company lay its own rails and permit it (the Yazoo & Mississippi Valley Railroad Company), to use the same free of charge, and notified it that it was a mere licensee in the use of said tracks, and that, if that offer was not acceptable, said spur tracks would be torn up and removed.

Thereupon the Yazoo & Mississippi Valley Railroad Company filed its bill in the chancery court of Washington county, based upon said contract with said Castleman, for the construction of said spur tracks, and obtained an injunction against said Castleman and the Delta Southern Railway restraining them from tearing up said tracks.   A few days thereafter the Belzoni Oil Company, not being party to that suit, filed its bill in said court, alleging, in substance, that it was the owner of the land occupied by said spur tracks, that said Castleman had no interest in said land and no authority to make said contract for

the construction of said tracks, and that the same, having been constructed without its consent or authority, became its property as a fixture, and thereupon obtained an injunction restraining the Yazoo & Mississippi Valley Railroad Company from interfering with the crossing of said spur tracks and connecting therewith by the Delta Southern Railway.  To that bill of the Belzoni Oil Company the Yazoo & Mississippi Valley Railroad Company filled its answer, and afterwards said railroad company filed an amended and supplemental bill to the original bill, making said Belzoni Oil Company a party and praying for an injunction against said oil company and the original defendants, the Delta Southern Railway and said S. Castleman, restraining them from crossing said spur tracks, or making any connection therewith by the Delta Southern Railway, whereupon the chancellor, being unwilling to grant an injunction, in view of the different injunctions then pending, without notice and a hearing, cited the defendants thereto, said Belzoni Oil Company, the Delta Southern Railway and S. Castleman, to show cause on a given day why the injunction should not be granted as prayed for.

In the meantime the Belzoni Oil Company asked for and obtained leave of the chancellor to file an amended bill in its suit against the Yazoo & Mississippi Valley Railroad Company, praying for a mandatory injunction against said railroad company, restraining it from any further use or occupancy of its land by said spur tracks, and commanding said railroad to remove said tracks within a given time, to be named by the court. This amended bill of the Belzoni Oil Company differed from its original bill, in that in the original bill said oil company claimed to own said spur tracks as fixtures to its land, and sought to enjoin the railroad company from interfering with the oil company in effecting a crossing of its spur tracks and connection therewith by the Delta Southern Railway, whereas in the amended bill the oil company claims that said spur tracks were there under a mere license, which had been revoked, that

said railroad company in its continuous use of said tracks was a continuous trespasser, and that its obstruction of the Delta Southern Railway in crossing and connecting with said spur tracks was a serious injury to the oil mill company in the conduct of its business and an unjustifiable interference with its control over its own property, and therefore it prayed for a mandatory injunction restraining the said railroad company from further use of said tracks and commanding it to remove the same from the oil company's land within a given time.

Said railroad company made a motion to dissolve the injunction granted on said oil company's original bill, and this motion, together with the application by the railroad company for an injunction on its amended and supplemental bill, and the application of the oil company for a mandatory injunction on its amended bill, were by consent of parties and of the chancellor heard in vacation, as one cause and at one time, upon all the papers in the several causes and upon affidavits that were taken by both sides; and said railroad company, in all of its pleadings in the several causes—that is to say, in its original bill, in its answer to said oil company's original bill, in its amended and supplemental bill, and in the affidavits filed in its behalf—founded its rights in the premises upon the aforesaid instrument with said Castleman for the construction of said spur tracks, and the fact that the oil company had the use of said tracks without objection or complaint, while the oil company showed it was the owner of the land occupied by said tracks, and never had any knowledge of said contract, or of its existence, and used said tracks with the idea that they were constructed under a mere license. So that at the hearing of said motion and said applications the chancellor was as fully advised of all the facts regarding the rights of the parties as he would likely be at the final hearing of said matters, and the result was that the chancellor rendered a single decree in said several causes sustaining the railroad company's motion to dis-

solve the injunction granted upon the oil company's original bill, and refusing the railroad company's application for an injunction on its amended and supplemental bill, and granting the oil company's application for a mandatory injunction on its amended bill, restraining the railroad company from further using said spur tracks, and commanding it, within ten days from the date of the decree, to remove the same from said land. From that decree, in so far as it granted a mandatory injunction on the amended bill of the oil company, the Yazoo & Mississippi Valley Railroad Company asked for and obtained from the chancellor an appeal; and likewise from that decree, in so far as it dissolved the injunction granted on the oil company's original bill, the Belzoni Company asked for and obtained from the chancellor an appeal; and consequently both appeals and the facts underlying them are presented to the supreme court in one and the same record.

The instrument in this case is a license, and no more. It is in the following words and figures:

"This agreement, made and entered into this 22d day of May, A. D. 1900, by and between Stephen Castleman, of Belzoni, Mississippi, party of the first part, and the Yazoo & Mississippi Valley Railroad Company, party of the second part, witnesseth:

"Whereas, the party of the first part is engaged in business at Belzoni, in the state of Mississippi, and in order to facilitate the carrying on of the said business desires to have two spurs or side tracks constructed, connecting with the main track of the party of the second part at the said place, as shown by the red lines on the plan hereto attached, it is now mutually agreed as follows:

"(1) The party of the first part hereby agrees to furnish, free of charge to the party of the second part, all of the ground needed for the construction, use, and maintenance of the said spurs or side tracks, so far as the same shall extend beyond the right of way and grounds of the party of the second part, and to give the party of the second part secure and exclusive possession

thereof, and to maintain the party of the second part in such possession so long as this agreement shall continue in force.

"(2) The party of the first part hereby agrees to do all of the grading and to furnish all of the cross-ties and switch ties needed for the construction of the said spur or side tracks, and to renew the same when required, and to keep and maintain said tracks in good and safe repair and condition, so long as the same shall be needed for his benefit or accommodation. All work done or material furnished by the party of the first part to be satisfactory in all respects to the chief engineer of the party of the second part.

"(3) Upon the completion of the grading to the satisfaction of the said chief engineer, and the delivery upon the ground of the ties of such size, shape, and kind as he shall require, the party of the second part hereby agrees to lay and construct the said track, and to furnish all of the rails, switches, frogs, spikes, and joints fastenings needed therefor.

"(4) The party of the first part hereby agrees to indemnify the party of the second part and to save it harmless from any liability for damage by fire, which, in the use of the said spurs or side tracks, or in the operation of the railroad of the party of the second part, or from cars or engines on its tracks, may be communicated to any building or structure belonging to or occupied by the party of the first part at Belzoni aforesaid, or to any goods, wares, merchandise, or other property which may be stored therein or on the premises adjacent thereto, to whatever cause the said fire may be attributable.

"(5) It is understood and agreed that the party of the second part shall be the owner of the said spurs or side tracks and of all material used in their construction, and shall have the right at any time in its discretion to abandon the use of said tracks and to take up and remove all of the material used in their construction from the premises occupied by the same, provided that a written notice of its intention to remove the said tracks shall be given to the party of the first part thirty days before the removal of the same is to be commenced.

"(6) This agreement shall be binding on the heirs, executors, administrators, and assigns of the party of the first part, and on the successors and assigns of the party of the second part.

"In witness whereof, the parties hereto have caused these presents to be executed in duplicate the day and year first above written.     Stephen Castleman.

"The Yazoo & Mississippi Valley Railroad Co.,

"By J. T. Harahan, Second Vice President."

This instrument conferred upon the Yazoo & Mississippi Valley Railroad Company a mere license. It is not a contract in any proper legal sense. It is simply a license, and nothing more. It is not a license coupled with any interest in the land. There are no words of grant in the instrument. The agreement on the part of Castleman was to "furnish" the land, material, etc. There cannot be worked out of this instrument any grant of an estate in or easement over in said land. At the time, too, that this instrument was executed, the title to the land was not in Castleman, but in the Belzoni Land Company, a corporation, which afterwards conveyed the land by deed to the Belzoni Oil Company, another corporation, which afterwards constructed this mill plant thereon. Whilst it is true that Castleman signed the instrument in his individual capacity, there are several important facts counter to the claim of the Belzoni Oil Company on this point to be carefully noted. First, the very machinery and material out of which this oil mill was built was transported over this spur track, built under this license executed in the year 1900. The Belzoni Oil Company began operation, and the business transactions between the oil mill company and the Yazoo & Mississippi Valley Railroad Company were entirely satisfactory until six years thereafter; all tracks being used as intended for the benefit of the said oil mill company. The president of the Belzoni Oil Company knew, and the company, under the facts in this case, must necessarily have known of this use of this spur track for this length of

time, and have acquiesced in its use.    It is further shown that this supply track, switches, etc., constituting the spur track, cost about $1,000, of which the railroad company paid something over $700, and the oil company something over $200.

We think the court did not err in granting the mandatory injunction restraining the Yazoo & Mississippi Valley Railroad Company from further use of the spur tracks and commanding it to remove them.    The Yazoo & Mississippi Valley Railroad Company should have made inquiry as to the title to the land, and the slightest inquiry would have revealed the fact that the title was not in Castleman, but in the Belzoni Lumber Company.    There are no words of grant in the instrument.    It was revocable, and under the facts in this case it could be revoked without refunding any money spent by the Yazoo & Mississippi Valley Railroad Company.    That line of cases which holds that, where one has entered under a license and expended large sums for improvements, etc., the other, the licensor, may not revoke the license without refunding the money so expended, this court has declined to follow.    *Beck v. L., N. O. & T. R. Co.,* 65 Miss. 172, 3 South. 252.    See, also, the valuable note of Mr. Freeman in *Lawrence v. Springer* (N. J. Eq.), 31 Am. St. Rep. 712.    It is to be noted that many of the cases in which the licensor was held estopped, under circumstances of this sort, are from states in which part performance of a contract takes it out of the operation of the statute of frauds.    That exception this court has distinctly refused to engraft upon the statute.    In *Beck's case, supra,* Judge CAMPBELL, speaking for the court, expressly held that, though this doctrine might obtain elsewhere, it had no footing in our jurisprudence, and that a mere license, even for valuable consideration and where great expense had been incurred by the licensee, was revocable at the will of the licensor.

It is further held in 25 Cyc. 645, that it makes no difference whether the license is oral or in writing; and most manifestly it could not, since the nature of a license is not affected by the

mode of establishing its existence, whether by oral proof, or whether by the production of an instrument of writing. Mr. Freeman, in the note referred to, fully considers both lines of authority, both those cases holding that the licensor may at his option, revoke the license without reimbursement to the licensee, and those holding the contrary doctrine, and says the former line of cases holding the better view, and cites the case of *Beck, supra,* as belonging to that class of cases. The best statement of the law on this subject which we find, and one which we quote with approval, is contained in *Crosdale v. Lanigan,* 129 N. Y. 604, 29 N. E. 824, 26 Am. St. Rep. 551, cited by Mr. Freeman in the note referred to. In that case the court said: "There has been much contrariety of decison in the courts of different states and jurisdictions. But the courts in this state have upheld with great steadiness the general rule that a parol license to do an act on the lands of the licensor, while it justifies anything done by the licensee before revocation, is nevertheless revocable at the option of the licensor; and this, although the intention was to confer a continuing right, and money had been expended by the licensee upon the faith of the license. This is plainly the rule of the statute. It is also, we believe, the rule required by public policy. It prevents the burdening of lands with restrictions founded upon oral agreements easily misunderstood. It gives security and certainty of titles, which are most important to be preserved against defects and qualifications not founded upon solemn instruments. The jurisdiction of courts to enforce oral agreements for the sale of land is clearly defined and well understood, and is indisputable; but to change what commenced in a license into an irrevocable right, on the ground of equitable estoppel, is another and quite different matter. It is far better, we think, that the law requiring interests in land to be evidenced by deed should be observed, than to leave it to the chancellor to construe an executed license as a grant, depending upon what, in his view, may be equity in the special case."

We do not think there is anything in the contention of the

Belzoni Oil Company that it was not a party to this instrument. We think the conduct of the Belzoni Oil Company has been such as that this instrument is to be dealt with just as if it had been executed by said corporation. Manifestly it is estopped to say that it did not execute the instrument, after enjoying all the fruits the instrument was intended to secure. Treating the instrument as executed by the Belzoni Oil Company, it still remains in its nature nothing but a license, and on the facts in this case it is evident that the license had been revoked. We are therefore of the opinion that the action of the chancellor in granting the mandatory injunction was correct, and that decree is affirmed.

Coming, now, to the action of the chancellor in dissolving the injunction on the original bill of the Belzoni Oil Company, it is earnestly insisted by the learned counsel for the Yazoo & Mississippi Valley Railroad Company that the amended bill should not have been allowed to have been filed, on the ground that the amended bill stated an entirely new and different cause of action from that set out in the original bill; and it is further insisted that the chancellor erred in allowing the amendment to be filed, because, in determining whether the injunction granted on the original bill should be dissolved, the chancellor should have looked only to the original bill and not at all to the amended bill. Treating the last proposition first, it is to be noted that in the case of *Conover v. Ruckman,* 34 N. J. Eq. 293, it is held that an injunction bill may be amended even after the motion to dissolve, and that if, when so amended, it shows sufficient cause for continuing the injunction, it will be continued, and the motion to dissolve on the ground of defects in the original bill will be overruled, where these defects have been remedied by reason of the amendment, which does not change the cause of action; and this case is approved, as to the announcement of this principle, in *Alcorn v. Alcorn,* 76 Miss. 907, 25 South. 877, and again in High on Injunctions, § 1484, it is said that, "although an injunction may have been improvidently or ir-

regularly allowed in the first instance, it will not be dissolved when it is apparent from the record that the plaintiff would be entitled to another injunction immediately upon the dissolution." We think this is a sound principle of chancery pleading, and that it was proper for the chancellor to look to the amended bill, as well as the original bill, in determining whether he would dissolve the injunction granted on the original bill. It is perfectly obvious that, though he might dissolve the injunction looking to the original bill, he was bound, under the allegations of the amended bill, to grant the injunction; and it is further obvious that the end sought to be obtained by both injunctions was practically the same. What sound reason can possibly be assigned for dissolving the injunction looking to the original bill alone, and immediately granting the same injunction, in effect, upon the filing of the amended bill? Especially is this principle applicable in a case like this, where all the bills for both parties were heard at the same time under an order of consolidation, and the equities, one way and another, dealt with as growing out of a common cause of action, to-wit, the instrument hereinbefore set out.

Recurring, now, to the first proposition, that the amended bill entirely changed the cause of action, we have to say that we think this contention, on the peculiar facts of this case, is not tenable. The principle that an amendment may not state a new and different cause of action is elementary. The trouble is in ascertaining whether it does that or not. The general principle is well stated in 16 Cyc. p 338, where it is said: "An amended bill must not be repugnant to the original one, nor may it present an entirely new and different case entirely changing the purpose of the suit. This principle is clear, but difficulties arise in determining what constitutes an essentially different case. A different case is not made by averments setting out a case more specifically or fully, or by adding new facts or grounds for relief consistent with those originally presented, although the relief demanded is thereby broadened, or

even changed, the main general object of the bill remaining the same." Many authorities are cited, illustrative of the principle, in the notes. It is held in *Belton v. Apperson,* 26 Grat. (Va.) 207, that the frame and structure of the bill may be amended, so as to obtain an entirely different relief.

But the case which we think is exactly in point here is the case of *McDonnell v. Finch,* 131 Ala. 85, 31 South. 594, in which it was held that an amendment changing the conclusions of the pleader upon the facts stated or praying a different relief is proper. The facts in that case were, as to this point, briefly these: The creditors of one Louis Finch filed a bill against him, alleging that he had certain fraudulent dealings with the Evergreen Bank and its president, and that Finch, to secure the bank, had transferred and assigned to said bank, as collateral security, for his alleged indebtedness, a large amount of property, considerably more than sufficient to pay the indebtedness of Finch to the bank, and that this transfer was fraudulent in fact, and made with intent to hinder, delay, and defraud Finch's other creditors. That, now, was the case made, those the facts stated, and it was contended that, because the pleader alleged that certain attachments, sued out against Finch's estate by the Bank of Evergreen and levied on all his property and effects, had the effect (that the suing out of the attachments had the effect) of operating as a general assignment of all the property and effects of Finch, so as to make said property and effects inure to the equal benefit of the complainants and all the other creditors. That being the conclusion drawn by the pleader from the facts which he had stated, he then specifically prayed that the effect of the suing out of said attachments be declared to operate as a general assignment of all the property and effects of Finch, so as to make them inure to the equal benefit of all creditors; but, in addition to this specifically prayed relief, the complainant also prayed for general relief. Afterwards an amended bill was filed by the complainants, in which they asked that that portion of the original bill alleging

that the suing out of said attachments operated as a general assignment should be stricken out, and that in lieu thereof there should be inserted an allegation that the suing out and levying of said attachments was done for the purpose of hindering, delaying, and defrauding complainants, and that said attachments were fraudulent and void as to complainants. Complainants further prayed that their special prayer be stricken out, and then prayed that said attachments be declared fraudulent, null, and void as to complainants. The respondents objected to the allowance of this amendment upon the ground that it made an entirely new and different cause of action, and on that point the court said that:

"Leaving out of view all conclusions of the pleader, and confining our consideration to the facts alleged in the bill, a clear case is made to have the writs of attachments declared fraudulent. *First Nat. Bank v. Acme White Lead & Color Co.,* 123 Ala. 344, 26 South. 354, and cases cited. Indeed, it is the only relief that could be granted upon proof of the facts averred. Clearly no case is made by it to have the attachments declared a general assignment. As a bill for that purpose, with the conclusions of the pleader in or out of it, and the special prayer in or eliminated, it would be without equity. *Supply Co. v. Lucas,* 119 Ala. 202, 24 South. 416. If, upon the facts alleged, the bill is without equity, the conclusions of the pleader predicated upon those facts, whether in the charging part of the bill or in the special prayer, or in both, cannot import equity into it. And the converse of the proposition is equally true. If, upon the facts alleged, the bill has equity, conclusions of the pleader and the special prayer will not destroy that equity. The real character of a suit in equity is to be determined from a consideration of the matters of substance embodied in the pleadings. *Ex parte Smith,* 34 Ala. 455; *Sayre v. Land Co.,* 73 Ala. 86. In cases of the character of the one under consideration, the facts upon which the relief sought depends, and not the conclusion of the pleader, consti-

tute the substance of the bill, and must control in determining its equity.   The bill under consideration is strikingly similar in averments and special prayer to the one passed upon by this court in *Steiner v. Parker,* 108 Ala. 357, 19 South. 386, in which the general averments or conclusions and the special prayer were disregarded, and effect was given to the facts alleged in conjunction with the general prayer for relief.   And the decision in that case is conclusive of the question raised in this.   It has never been supposed that a special prayer could be made the basis for relief inconsistent with the facts stated in a bill, or could impair its equity.   Under it, the court could only grant such relief as the case stated will justify.   If no case is made, no relief could be granted; and, if a case is stated which is inconsistent with the special prayer, relief may be granted under the general prayer, but not under the special prayer.   *Bailey v. Burton,* 8 Wend. (N. Y.) 399.   For 'a complainant can have no greater relief than the facts alleged in his bill warrant.'   *First Nat. Bank v. Acme White Lead & Color Co., supra; May v. Lewis,* 22 Ala. 646; *Betts v. Gunn,* 31 Ala. 219; *Munford v. Pearce,* 70 Ala. 452; *Rice v. Eiseman,* 122 Ala. 343, 25 South. 214.   The learned chancellor, in refusing to allow the amendments proposed by the complainant, proceeded upon the theory that the purpose of the bill was that of declaring the attachment proceedings a general assignment, and that, therefore, the amendments offered were a departure— a conclusion reached by him, doubtless, upon consideration of the general averments and special prayer, ignoring the facts alleged and the general prayer.   Perhaps it was upon this theory that he dismissed the bill for want of equity."

We approve the principles announced in this case as sound, and they exactly fit the point under discussion in the case at bar.   Both bills, the origial and the amended, in this case, sought to accomplish the same end, upon virtually the same facts, and merely assigned different reasons for accomplishing the end sought.   The foundation fact, the fact which controls

the whole case, is the instrument creating the license above set out. That instrument is substantially the basis for both the original and amended bills. The facts stated, as facts, are practically the same in both bills. Wherein, then, does the difference consist? Merely in the conclusions which the pleader drew as to what his relief should be in the original and in the amended bill. The complainant alleged in the original bill that the ties, etc., were its property as fixtures. That was not the allegation of a fact; but it was the statement of a conclusion the pleader drew from the facts as to what remedy he was entitled to. So, also, when, in the original bill, the complainants prayed for the specific relief, as if the ties, etc., had been the property of the complainant, that prayer for specific relief was no statement of any fact. It was simply the pleader's idea as to the relief that should be granted. The foundation fact, the instrument, was the same in both bills. The other facts were practically the same in both bills, and the only difference between the two—very great difference it is true, of its kind—was that the pleader in the one bill drew different conclusions and prayed different relief from the conclusions and relief he drew and prayed in the other. But the court or chancellor is not to grant relief on the pleader's conclusions, or to frame the relief by a specific prayer inappropriate to the facts on which the bill is bottomed. It is the duty of the court to look, not to what the pleader may have to say in stating his conclusions, or in framing his specific prayer, but to see what the facts—the very facts—are, and, if there be a prayer for general relief, to grant the relief the law allows, irrespective of the erroneous conclusions or mistaken prayer the pleader may incumber the bill with. What was the object of both these bills for injunction? Why, manifestly, to enable the Delta Southern Railway to run its track into the oil mill yards of the oil mill company. That was the thing sought to be obtained. The reasons of the pleader as to why it ought to be granted might be entirely erroneous; but that error would not prevent the court,

on a prayer for general relief, from granting such relief as the facts disclosed would be allowed. As said in the quotation from Cyc., *supra,* there was no change of the purpose of the bill, and "the main general objects of the bills" were the same.

We are therefore clearly of the opinion that the amendment was properly allowed, since it did not entirely change the purpose of the bill, and did not state in any legal proper sense a new and distinct cause of action. Since, therefore, the amendment was properly allowed, and since it was proper for the chancellor to look at both the original and amended bill in determining whether he would dissolve the injunction issued on the original bill, and since, also, if he had so dissolved it, as he did, he would have been compelled on the facts of this case and the pleadings to grant practically the same injunction on the amended bill, it was clearly erroneous for the court below to dissolve the injunction on the original bill.

Wherefore that decree is reversed, and the cause remanded, to be proceeded with in accordance with this opinion as to the action of the court in both causes.

*Reversed.*